# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| John Andreaccio, | Case No.: 2:22-cv-00672-JAD-NJK |
| Plaintiff | |
| v. | **Order Granting Defendants' Motion for Summary Judgment and Closing Case** |
| Joshua Weaver and Allen Lynn, | [ECF No. 23] |
| Defendants | |

Pro se plaintiff John Andreaccio sues Nye County police officer Joshua Weaver and police lieutenant Allen Lynn for violating his federal constitutional rights when Weaver pulled over Andreaccio for driving an unregistered vehicle on a highway and impounded his car. Andreaccio mainly theorizes that traffic, driver-licensing, and vehicle-registration laws don't apply to him because they regulate commercial activity only, and he was travelling for pleasure in a private capacity. The defendants move for summary judgment, arguing that Weaver had reasonable suspicion to stop Andreaccio because his vehicle had no visible license plates, that Weaver had probable cause to arrest Andreaccio for refusing to identify himself, and that Andreaccio has no evidence to support his other causes of action. Because Lynn's purely supervisory role does not subject him to § 1983 liability, Andreaccio cannot support his official-capacity claims against either Lynn or Weaver, and Weaver has shown his entitlement to summary judgment on Andreaccio's remaining claims against him based either on a lack of support in the record or qualified immunity, I grant the defendants' motion and close this case.

# Background[1]

On April 25, 2021, John Andreaccio took a day trip from Pahrump to Beatty, Nevada, with his wife and daughter.[2]  While returning to Pahrump that afternoon, Andreaccio noticed that Nye County police deputy Joshua Weaver began following his car for about three miles before pulling him over.[3]  Andreaccio's vehicle had no license plates nor notices of registration displayed.[4]  Weaver requested Andreaccio's driver's license and registration, and Andreaccio began a lengthy back-and-forth with the officer, arguing that he was not subject to such requirements because he was "traveling for pleasure in a private capacity" and was thus not "in commerce"—and traffic laws only apply to those "in commerce."[5]

At multiple times throughout the stop, Weaver made requests for Andreaccio to fully identify himself, but Andreaccio refused to do so.[6]  So Weaver arrested Andreaccio for obstruction and handcuffed him.[7]  After about 20 minutes, Weaver obtained an Arizona driver's

---

[1] Andreaccio objects to the defendants' "Statement of Undisputed Facts," ECF No. 23 at 3–9, arguing that "the fact that the [d]efendants claim to know anything about the [p]laintiff is absurd. The commentary . . . is certainly disputable but irrelevant to the matter at hand." ECF No. 26 at 14.  But a fact is disputed for purposes of Rule 56 only if "sufficient evidence supporting the claimed factual dispute" is identified "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) (quoting *First Nat'l. Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–90 (1968)).  Merely saying "objection" and observing that the facts are disputable does not create a genuine issue of disputed fact.  Thus, the facts identified in this section are those supported by the record, which consists mainly of Andreaccio's deposition testimony and the objectively verifiable events depicted on the recording from Weaver's body-worn camera during the stop, at ECF No. 23-1 and ECF No. 23-5, respectively.

[2] ECF No. 1 at 6; ECF No. 23-1 at 6, 11, 35–36.

[3] ECF No. 23-1 at 39.

[4] *Id.* at 7.

[5] ECF No. 1 at 3; ECF No. 23-1 at 32–34.

[6] ECF No. 23-1 at 28–29.

[7] ECF No. 23-5 (Weaver's body-camera footage) at 14:02:20.  Andreaccio notes that "the audio/video file evidence entered into the record . . . starts with an edit" because it is missing the

1    license from Andreaccio's pocket and released him from the handcuffs.[8]  Weaver then shifted his

2    inquiry to whether Andreaccio had proof of insurance for his vehicle, and Andreaccio claimed

3    that his proof of insurance could only be accessed on his cellphone but that there was no cell

4    service in the area.[9]

5         Because Andreaccio's car was unregistered and he could not provide proof of insurance,

6    Weaver issued citations and requested a tow for Andreaccio's car.[10]  Throughout the traffic stop,

7    Weaver placed multiple radio calls, providing updates on the situation.[11]  The record does not

8    reflect who the recipient of those calls was.  On the call following the tow request, Weaver

9    explained why he was impounding the car, stating "I don't feel comfortable letting [Andreaccio]

10   get back in his car unregistered, uninsured, driving down the highway."[12]  Afterwards, Weaver

11   offered Andreaccio and his family a lift back to Beatty, but Andreaccio refused it because he did

12   not want "to validate [Weaver] in any way."[13]

13        So Andreaccio and his family walked along the highway back to Beatty, where he placed

14   two calls: one to a friend to give him a ride back to Pahrump and the other to the Nye County

15   Sheriff's Office.  The latter call was answered by lieutenant Allen Lynn, the alleged supervisor

16

17

18   ───────────────

19   first part of the traffic stop.  ECF No. 26 at 3.  But he also states that "it is not [his] intent to challenge the validity of the entire file," so I take the footage as authentic as confirmed by both parties.

20   [8] ECF No. 23-5 at 14:17:00–21:34.

21   [9] ECF No. 23-1 at 20; ECF No. 23-5 at 14:29:30.

     [10] ECF No. 23-5 at 14:24:32; 14:33:13.

22   [11] *See, e.g., id.* at 13:57:00, 14:23:20.

23   [12] *Id.* at 14:58:35.

     [13] ECF No. 23-1 at 47–49.

on duty, who informed Andreaccio that he would need to contact the private tow company to retrieve his vehicle.[14]  Andreaccio paid $1,014.18 in impound and towing fees the next day.[15]

Andreaccio filed this suit against Weaver and Lynn in their individual and official capacities for violating his Fourth, Fifth, Eighth, and Fourteenth Amendment rights.[16]  The defendants now move for summary judgment on all claims, contending that the record does not support a violation of any constitutional right and that, even if there were violations, the defendants are shielded from this suit by qualified immunity.[17]  Andreaccio opposes that motion, leaning heavily on what he perceives as his unfettered, constitutional right to travel.

## Analysis

**I.     The defendants must show that the record presents no genuine dispute of material fact and that they are entitled to judgment as a matter of law to prevail on summary judgment.**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[18]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[19]  If the moving party satisfies his burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[20]  A defendant moving for summary judgment

---

[14] ECF No. 1 at 3–4; ECF No. 23-1 at 43–45.

[15] ECF No. 23-1 at 51–52.

[16] ECF No. 1.

[17] ECF No. 23.

[18] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[19] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[20] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

doesn't have to produce evidence to negate the plaintiff's claim; he merely has to point out the evidence that shows an absence of a genuine material factual issue.[21]  The defendant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of [a plaintiff's claim] necessarily renders all other facts immaterial."[22]

## II.   Andreaccio's claims against Lynn fail as a matter of law because a supervisory position alone does not support § 1983 liability.

Andreaccio contends that Lynn is liable in his supervisory capacity under § 1983 for Weaver's violations of his constitutional rights.  He theorizes that, because Lynn "denied any assistance" and "refused to right the wrongs of his subordinate,"[23] Lynn was acting "in concert and complacent with" Weaver's actions and refused to properly exercise the authority he possessed as "the Sheriff's Supervisor-on-Duty" to stop the towing of his car.[24]  Both parties appear to agree that Lynn's personal participation in the traffic stop was limited to this post-stop, post-impound phone call.

A defendant is liable under § 1983 "only upon a showing of [his] personal participation."[25]  So, for a supervisor to be held liable for the constitutional violations of his subordinates, the supervisor must have "participated in or directed the violations, or knew of the violations and failed to act to prevent them."[26]  Thus, for Lynn to be accountable to Andreaccio

[21] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[22] *Celotex*, 477 U.S. at 322.

[23] ECF No. 1 at 4.

[24] *Id.* at 6–7.

[25] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[26] *Id.*

under § 1983 here, Andreaccio must show that Lynn directed the conduct at issue or knew about Weaver's violations and failed to act to prevent them.[27]  He "must go beyond the pleadings and by [his] own evidence set forth specific facts showing that there is a genuine issue for trial"[28] by "identify[ing] with reasonable particularity the evidence that precludes summary judgment."[29]

Andreaccio argues that Lynn is responsible for "that which occurs on his shift" and points to the "audio/video in record" as evidence that Weaver was "not acting alone."[30]  But there is no evidence in the record that Lynn was directing Weaver's actions.  The record is devoid of evidence that Lynn was the recipient of Weaver's radio transmissions during the traffic stop. Plus, the body-camera footage of those calls shows that Weaver used phrases such as "just gonna let you know"[31] and "just giving you a heads up,"[32] which is informative language, and nothing in those exchanges suggests that Weaver's actions were being directed by a supervisor.[33] Andreaccio thus cannot show that Lynn was directing Weaver's actions during the traffic stop or that Lynn had knowledge of Weaver's actions before Andreaccio called him and could have— but failed to—prevent them.  Because Andreaccio identifies no evidence that Lynn personally participated in, directed, or knew of and failed to prevent the constitutional violations that

---

[27] *Id.*

[28] *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (quotations omitted) (quoting Fed. R. Civ. P. 56(e)).

[29] *Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996).

[30] ECF No. 26 at 25.

[31] *Id.* at 13:57:02.

[32] *Id.* at 13:58:16.

[33] *See, e.g.,* ECF No. 23-5 at 13:57:00, 14:23:20.

Andreaccio alleges, Lynn is entitled to summary judgment in his favor on all claims against him in his individual capacity.[34]

**III.    The record does not support any official-capacity liability for Andreaccio's constitutional claims.**

Although Andreaccio asserts several of his claims against Weaver and Lynn in their official capacities,[35] the law recognizes that such claims are actually "against the governmental entity itself."[36]  So I construe Andreaccio's official-capacity claims against Lynn and Weaver as municipal-liability ones.  The United States Supreme Court held in *Monell v. Department of Social Services of the City of New York* that a municipal entity like Nye County can be held liable for the constitutional violations of its officers (and officers can be held liable in their official capacities) only if the plaintiff can show that the violations occurred because the officer was carrying out a municipal policy or custom that caused the constitutional injury.[37]  "A policy can be one of action or inaction."[38]  For instance, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."[39]

---

[34] Even if the record could support such findings, no § 1983 liability could for Lynn because the acts of Weaver are either not constitutional violations, *see infra* at pp. 8–22, or shielded by qualified immunity.  *See infra at* pp. 22–27.

[35] ECF No. 1 at 5.

[36] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

[37] *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *Monell*, 436 U.S. at 690).

[38] *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[39] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

1    Andreaccio contends that the county failed to act to correct Weaver's constitutional

2  violations when "multiple requests for a supervisor were made, only to be told there was no

3  supervisor on duty at the time."[40]  But Andreaccio points to no policy or custom underlying this

4  claim against the county.  And even if this single-day incident were a constitutional violation, the

5  Supreme Court held in *City of Oklahoma City v. Tuttle* that "proof of a single incident of

6  unconstitutional activity is not sufficient to impose liability under *Monell*[;] . . . the existence of

7  the unconstitutional policy, and its origin, must be separately proved."[41]  Andreaccio thus cannot

8  prevail on his official-capacity claims against Lynn or Weaver, so I grant summary judgment on

9  these claims in favor of the defendants.

10 **IV.     The record does not support any claim against Weaver in his individual capacity.**

11    Having resolved Andreaccio's claims against Lynn and his official-capacity claims

12 against Weaver, I turn to the remaining claims against Weaver in his individual capacity.

13 Andreaccio theorizes that Weaver violated his Fifth and Fourteenth Amendment due-process

14 rights when Weaver conducted "an investigation" into him without "a complainant" and then

15 impounded his car.[42]  He claims that Weaver violated his Fourth Amendment rights by

16 "accost[ing] and inquir[ing] the identity of" Andreaccio in his "private status" during the traffic

17 stop.[43]  He also alleges that his Eighth Amendment rights were violated when he had to pay

18 "unjust fines" to retrieve his car from the impound lot and had his medical conditions

19

20

---

[40] ECF No. 26 at 29.

[41] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985); but see *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (holding that "a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . ." (emphasis added)).

[42] ECF No. 1 at 7.

[43] *Id.* at 8.

1 exacerbated as a result of the experience.[44]  Weaver responds that none of these facts rises to a

2 constitutional violation and, regardless, he is shielded from liability by the doctrine of qualified

3 immunity.[45]

4 **A.  Andreaccio's right-to-travel theory is frivolous.**

5 Undergirding all of Andreaccio's traffic-stop-related claims against Weaver is his belief

6 that the state's licensing and registration requirements for vehicles and drivers don't apply to

7 him.  Based on that view, Andreaccio takes issue with the very idea that this case involved a

8 "traffic stop."[46]  He contends that he was not "in traffic" because of his "overt avoidance of

9 creating a vehicle, avoiding the use of license and other marking that may give the inference of a

10 vehicle in commerce, supported by the People[']s repeated, expressed proclamation of a private

11 capacity; 'not-in-commerce,' and most importantly, remaining in the grace of God."[47]  He insists

12 that "this Plaintiff has clearly taken the necessary precautions not to appear as an actor in

13 traffic."[48]  And he wasn't "a driver" under the law because he essentially opted out of highway

14 laws by "not designat[ing] by registration with the state and adorning license plates for a

15 designated use."[49]  This, he suggests, is his constitutional right to free travel.[50]

16

17

18

19 _____

20 [44] *Id.* at 8–9.

[45] ECF No. 23 at 3.

21 [46] ECF No. 26 at 6.

[47] *Id.*

22 [48] *Id.*

23 [49] *Id.*

[50] *Id.* at 29.

9

This misguided theory is just one iteration of the "sovereign citizen" ideology[51]—an ideology that the Ninth Circuit has deemed frivolous and "entirely without merit."[52]  Those attempting to exempt themselves from governmental rules, regulations, and licensing or permitting requirements by subscribing to this philosophy "believe they are not required to have driver's licenses, license plates, [or] vehicle registration . . . ."[53]  They "place special emphasis on the words being used.  They differentiate between a driver and a traveler; an automobile and a motor vehicle; commercial and non-commercial; and public versus private conveyances."[54]  They rely on isolated definitions from Black's Law Dictionary.[55]  And though Andreaccio insists that he is not a sovereign citizen,[56] he does all of this in his complaint and his summary-judgment brief.[57]

Andreaccio's right-to-travel theory lacks a true basis in the law and is patently frivolous—as every court to confront it has held.[58]  Although there is a constitutional right to travel, that right is not unfettered, and it does not include the right to drive a motor vehicle on

---

[51] *See Bey v. Elmwood Place Police Dep't*, 2018 WL 4354541 at *1 (6th Cir. May 18, 2018) (describing similar right-to-travel argument as one "rooted in the theories of the sovereign citizen movement").

[52] *United States v. Marks*, 530 F.3d 799, 811 (9th Cir. 2008).

[53] Caesar Kalinowski IV, *A Legal Response to the Sovereign Citizen Movement*, 80 Mont. L. Rev. 153, 167 (2019).

[54] *Id*. at 167–68.

[55] *Id*. at 169.

[56] ECF No. 23-1 at 46.

[57] *See generally* ECF Nos. 1, 26.

[58] *See, e.g., Berry v. City of St. Louis*, 2021 WL 4191612 at *5 (E.D. Mo., Sept. 15, 2021) (collecting cases); *see also Augmon v. Pennsylvania*, 2022 WL 16966723 at *3 (W.D. Pa. Oct. 25, 2022) (rejecting right-to-travel theory and concluding that "merely because [p]laintiff's vehicle was stopped and towed (because he did not have proper registration) does not mean that his constitutional right to travel was impeded").

public roads free from state-government requirements for licensing and registration.[59]  To borrow from the Ninth Circuit's opinion in *Miller v. Reed*, "burdens on a single mode of transportation do not implicate the right to interstate travel. . . . What is at issue here is not [Andreaccio's] right to travel interstate, but his right to operate a motor vehicle on the highways, and we have no hesitation in holding that this is not a fundamental right" because there is no "fundamental right to drive a motor vehicle."[60]  And the United States Supreme Court has made it clear that states can condition the privilege to drive on public roads on compliance with licensing and registration requirements.[61]  So, to the extent that Andreaccio's claims are grounded in a violation of the constitutional right to travel or his belief that he doesn't need a license or registration to drive on public roads, they fail as a matter of law.

---

[59] *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009) (noting that "no one has a right to drive; driving on public highways is a privilege subject to revocation for a number of reasons").

[60] *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (quoting *Berberian v. Petit*, 374 A.2d 791 (R. I. Sup. Ct. 1977)).

[61] *See Reitz v. Mealey*, 314 U.S. 33, 36 (1941), overruled in part on other grounds by *Perez v. Campbell*, 402 U.S. 637 (1971) ("The use of the public highways by motor vehicles, with its consequent dangers, renders the reasonableness and necessity of regulation apparent.  The universal practice is to register ownership of automobiles and to license their drivers. Any appropriate means adopted by the states to insure competence and care on the part of its licensees and to protect others using the highway is consonant with due process."); *Hendrick v. State of Maryland*, 235 U.S. 610, 622 (1915) (noting that "a state may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles,-those moving in interstate commerce as well as others.  And to this end it may require the registration of such vehicles and the licensing of their drivers . . . . This is but an exercise of the police power uniformly recognized as belonging to the states and essential to the preservation of the health, safety, and comfort of their citizens; and it does not constitute a direct and material burden on interstate commerce.).

1

2

**B.     Andreaccio has not shown that he was subjected to cruel and unusual punishment based on the exacerbation of his medical conditions.**

3       Andreaccio also theorizes that he was subjected to cruel and unusual punishment in

4 violation of the Eighth Amendment because the traffic stop exacerbated unspecified medical

5 conditions he was already suffering from.[62]  The Eighth Amendment's protection against cruel

6 and unusual punishment "was designed to protect those convicted of crimes" and thus applies

7 "only after the [s]tate has complied with the constitutional guarantees traditionally associated

8 with criminal prosecutions."[63]  Because Andreaccio was not a convicted person with respect to

9 the facts of this case, if any constitutional provision governs his cruel-and-unusual punishment

10 claims, it's the Fourteenth Amendment, which protects this right for pretrial detainees.[64]

11       To prevail on such a claim, Andreaccio must show that (1) Weaver "made an intentional

12 decision with respect to the conditions" of Andreaccio's detainment; (2) "[t]hose conditions put

13 [Andreaccio] at substantial risk of suffering serious harm"; (3) Weaver "did not take reasonable

14 available measures to abate that risk"; and (4) "[b]y not taking such measures," Weaver caused

15 Andreaccio's injuries.[65]  But Andreaccio's entire cruel-and-unusual-punishment theory consists

16

---

[62] ECF No. 1 at 9.

17

[63] *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671,
18 n.40 (1977)).

[64] The Supreme Court defines pretrial detainees as "persons who have been charged with a crime
19 but who have not yet been tried on the charge."  *Bell v. Wolfish*, 441 U.S. 520, 523 (1979).  It is
unclear from the record whether Andreaccio was a pretrial detainee during the traffic stop.
20 While Andreaccio was given citations for driving an unregistered vehicle and failing to present
proof of insurance, ECF No. 23-5 at 14:24:32, there is nothing to suggest that these citations
21 were criminal charges.  Even if I liberally construe his claim as one under the Fourteenth
Amendment, *see, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted) (holding
22 that pro se pleadings like Andreaccio's are "to be liberally construed"), Andreaccio cannot
prevail on a cruel-and-unusual punishment theory, so I assume without deciding that he would
23 qualify for this Fourteenth Amendment protection.

[65] *Castro v. City of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).

of just one reference in the complaint to unspecified medical conditions, and he does not address this claim at all in his response to the defendants' motion.[66]  I find that Andreaccio cannot establish on this record that Weaver subjected him to cruel and unusual punishment in violation of any constitutional provision.  So Weaver is entitled to summary judgment on Andreaccio's cruel-and-unusual-punishment claim.

### C.   A private towing-company charge is not a constitutionally actionable fine.

Andreaccio next claims that he was subjected to an unjust fine in violation of the Eighth Amendment when Weaver confiscated his car and had it towed "an extreme distance of seventy-five miles when a closer storage facility exist[ed]" in order to impose "unjust fines . . . paid for threat of permanent loss of property."[67]  The excessive-fines clause of the Eighth Amendment is not restricted to criminal convictions and applies to the states through the Fourteenth Amendment.[68]  That clause "limits the government's power to extract payments, whether in cash or kind, as punishment."[69]  For purposes of this clause, a fine is defined as a "payment to a sovereign as punishment for some offense."[70]

In his responses to the defendants' discovery requests, Andreaccio acknowledged that "Nye County, its affiliates, departments, and agents have not received funds" and that he had "no evidence that . . . Weaver received funds or financial benefit from [the private towing company],

---

[66] ECF No. 1 at 9; ECF No. 26 at 24.

[67] ECF No. 1 at 9.

[68] *Timbs v. Indiana*, 139 S. Ct. 682, 686–87 (2019); *see also Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020).

[69] *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)).

[70] *Austin*, 509 U.S. at 622.

related to the towing and/or impound" of his car.[71]  And in support of summary judgment, Weaver argues that, because "there [was] no payment to the sovereign as punishment for some offense via any costs [Andreaccio] incurred in retrieving his vehicle," he can't establish a constitutional violation based on the facts here.[72]  So Andreaccio instead argues that the defendants, "by their contracted partner, acted by proxy" in imposing the fine on him.[73]  But the Supreme Court's definition of a fine for Eighth Amendment purposes contemplates "payment to a sovereign" only,[74] and there was none here.  Because Andreaccio cannot establish that the tow and impound fees violated the excessive-fines clause, Weaver is entitled to summary judgment on that claim, too.

### D.   Andreaccio has not shown that his due-process rights were violated.

Andreaccio claims that he was deprived of constitutional due process when he was "interrogat[ed]" and arrested, and his car was impounded.[75]  The Fifth Amendment "prohibits the federal government from depriving persons of due process, while the Fourteenth Amendment explicitly prohibits deprivations without due process by the several states."[76]  Due-process claims can be sorted into two types: (1) those brought under the substantive component of the due-process clause, which "bars certain arbitrary, wrongful government actions, 'regardless of the fairness of the procedures used to implement them[,]'" and (2) those brought under the procedural component of the due-process clause, which prohibits deprivations of life, liberty, or

---

[71] ECF No. 23-3 at 14 (answers 24 and 25).

[72] ECF No. 23 at 20–21.

[73] ECF No. 26 at 24.

[74] *Austin*, 509 U.S. at 622.

[75] ECF No. 1 at 7; ECF No. 26 at 10.

[76] *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005).

property without fair procedure.[77]  To succeed on a substantive-due-process claim, a plaintiff must show that the official's conduct "shocks the conscience" and that the official acted "with a purpose to harm for reasons unrelated to legitimate law-enforcement objectives."[78]  And to prevail on a procedural-due-process claim, he must prove that he was denied a specified liberty or property interest protected under the due-process clause and that he was deprived of that interest without the constitutionally required procedures.[79]

Andreaccio does not specify whether his due-process claim is procedural or substantive, so I liberally construe his complaint to raise both types.  He broadly theorizes that the defendants deprived him of due process under the Fifth and Fourteenth Amendments by taking his "private property for public use without just compensation" when Weaver impounded his car.[80]  He alleges that the towing was a confiscation "constitut[ing] public use" because the Nye County sheriff received "financial gains as a result," employing the language of the Fifth Amendment to make a takings argument.[81]  Andreaccio also theorizes that his rights were violated when Weaver "initiated an investigation" into him and imposed fines on him "without due process."[82]  He cites the United States Supreme Court case *Miranda v. Arizona* to support his claim that "an

---

[77] *Zinermon v. Burch*, 494 U.S. 113, 125 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

[78] *Porter v. Osborn*, 546 F.3d 1131, 1142 (9th Cir. 2008); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998).

[79] *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

[80] ECF No. 1 at 7.

[81] *Id.*; U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation").

[82] ECF No. 1 at 6, 9.

1  interrogation was taking place without reason, with a false arrest[,]" in violation of the Fifth

2  Amendment.[83]

3

4  **1.    *Andreaccio cannot establish that Weaver violated his substantive-due-
    process rights.***

5          As a matter of law, Andreaccio cannot rely on the Fifth Amendment to the United States

6  Constitution for his property-deprivation theory because he is suing state—not federal—officials,

7  and the Fifth Amendment only applies to conduct by the federal government.[84]  So I liberally

8  construe Andreaccio's Fifth Amendment claim as one raised under the Fourteenth Amendment,

9  which applies to state actors.  But Andreaccio also can't invoke Fourteenth Amendment

10 protections to allege a substantive-due-process claim based on an allegedly unreasonable search

11 or seizure.  In *Graham v. Connor*, the United States Supreme Court held that, "[b]ecause the

12 Fourth Amendment provides an explicit textual source of constitutional protection against this

13 sort of physically intrusive governmental conduct, that Amendment, not the more generalized

14 notion of 'substantive due process,' must be the guide for analyzing these claims."[85]  Because

15 Andreaccio cannot state a Fifth or Fourteenth Amendment substantive-due-process claim on

16 these facts, Weaver is entitled to summary judgment on any such claim.

17 **2.    *Weaver did not violate Andreaccio's procedural-due-process rights.***

18         Andreaccio bases his procedural-due-process claim on abstract rights of "[a]cquiring,

19 [p]ossessing, & [p]rotecting property and pursuing and obtaining safety . . . includ[ing]

20 protecting that property from forced, harmful contracts with anyone else."[86]  He also claims that

21 

---

22 [83] ECF No. 26 at 10.

[84] *Castillo*, 399 F.3d at 1002 n.5.

23 [85] *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[86] ECF No. 26 at 5.

1  Weaver "initiated an investigation without due process"[87] and had "fines imposed [on him]

2  without due process."[88]  But Andreaccio does not allege that any particular *process*—let alone

3  one that was constitutionally required—was denied him.  Rather, he theorizes that the

4  investigatory stop, request to identify, arrest, and vehicle impoundment should not have

5  happened at all, which cannot support a procedural-due-process claim.

6         Andreaccio also doesn't identify any evidence to back up his claim.  When asked in his

7  deposition what process was due to him at the traffic stop, Andreaccio stated only that Weaver

8  should have taken his word that Andreaccio was not operating "as a commercial entity or a

9  driver" and then "should have walked away."[89]  Because it is apparent that Andreaccio's

10  procedural-due-process claim is rooted in his frivolous right-to-travel theory, and he has not

11  established that Weaver violated any procedural-due-process right, Weaver is entitled to

12  summary judgment on Andreaccio's procedural-due-process claim, too.

13  **E.    The record does not show that Weaver violated Andreaccio's Fourth
        Amendment rights during the traffic stop, demand for identification, or
14      arrest.**

15         Traffic stops are considered seizures under the Fourth Amendment.[90]  The Supreme

16  Court has held that a traffic stop is constitutional under the Fourth Amendment if "there is at

17  least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is

18  not registered . . . ."[91]  Reasonable suspicion "is formed by specific, articulable facts which,

19

20  ---

[87] ECF No. 1 at 6.

21  [88] *Id.* at 9.

22  [89] ECF No. 23-1 at 31.

[90] *U.S. v. Rojas-Millan*, 234 F.3d 464, 468 (9th Cir. 2000) (citing *Delaware v. Prouse*, 440 U.S.
23  648, 653 (1979)).

[91] *Prouse*, 440 U.S. at 663.

together with objective and reasonable inferences, form the basis for suspecting that a particular person detained is engaged in criminal activity."[92]  "The reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests."[93]

Andreaccio alleges that he was unlawfully "accost[ed]" and required to identify himself despite being "in a private status."[94]  He claims that Weaver violated his privacy and committed a "warrantless search[] and warrantless confiscation of private property" during the traffic stop, arrest, and the subsequent towing of his car.[95]  Weaver responds that his actions were constitutional because he had probable cause to believe Andreaccio was breaking traffic laws and that Nevada law permits an officer to detain a person suspected of committing a crime for purposes of determining his identity[96] and also authorizes an officer to seize and impound a vehicle operating without registration under a community-caretaking purpose.[97]

### 1.    The traffic stop did not violate Andreaccio's Fourth Amendment rights.

The facts do not support Andreaccio's claim that Weaver violated his Fourth Amendment rights when he pulled him over and initiated a traffic stop.  The Supreme Court specified in *Delaware v. Prouse* that an officer's mere reasonable suspicion that a car is unregistered is enough to make that stop constitutional under the Fourth Amendment.[98]  In *Prouse*, the Court

---

[92] *Rojas-Millan*, 234 F.3d at 468–69.

[93] *Prouse*, 440 U.S. at 654.

[94] ECF No. 1 at 8.

[95] ECF No. 26 at 5; ECF No. 1 at 8.

[96] ECF No. 23 at 17 (citing Nev. Rev. Stat. § 171.123(1)).

[97] *Id.* at 11–13 (citing Nev. Rev. Stat. § 482.540(1)(a)).

[98] *Prouse*, 440 U.S. at 663.

explained that states' registration requirements "are designed to keep dangerous automobiles off the road" and are thus "essential elements in a highway safety program."[99]  Thus, though Andreaccio believes that "traffic laws[,]" such as license and registration requirements, "have nothing to do with public safety[,]" the Supreme Court categorically disagrees.

As Andreaccio admitted in his deposition, he also had no license plates or public notices of registration displayed on his vehicle when Weaver stopped him.[100]  Nevada law requires that "every owner of a motor vehicle . . . intended to be operated upon any highway in this [s]tate" must "apply to the Department [of Motor Vehicles]. . . and obtain the registration thereof."[101] Drivers are also required to display license plates on their vehicles.[102]  It is thus reasonable that Weaver would suspect that Andreaccio was driving an unregistered vehicle because his car had no license plates or other visible indications of registration.  So the record does not support that Weaver violated Andreaccio's Fourth Amendment rights when he pulled him over.

### 2.    *Weaver did not violate Andreaccio's constitutional rights when he asked him to identify himself.*

Andreaccio next claims that Weaver's demand for identification violated his rights against unreasonable search and seizure.  The Supreme Court has observed that "an officer's mission includes ordinary inquiries incident to the traffic stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the

---

[99] *Id.* at 658.

[100] ECF No. 23-1 at 7–8.

[101] Nev. Rev. Stat. § 482.205.

[102] Nev. Rev. Stat. § 482.275(1).

1  automobile's registration and proof of insurance."[103]  To facilitate those inquiries, Nevada

2  Revised Statute 171.123(3) allows police officers to detain someone suspected of criminal

3  activity "to ascertain the person's identity" and requires that person to identify himself.[104]  And

4  the United States Supreme Court specifically found NRS 171.123(3) consistent with the Fourth

5  Amendment in *Hiibel v. Sixth Judicial District Court of Nevada*.[105]  A police officer arrested

6  Hiibel for obstruction after he refused to identify himself, as required by Nevada law, during an

7  investigative stop in which he was suspected of committing an assault.[106]  The High Court held

8  that the defendant's arrest was constitutional under the Fourth Amendment balancing test

9  because a "request for identity has an immediate relation to the purpose, rationale, and practical

10 demands of"[107] an investigative stop and "obtaining a suspect's name . . . serves important

11 government interests" such as informing "an officer that a suspect is wanted for another offense,

12 or has a record of violence or mental disorder."[108]

13      Like the defendant in *Hiibel*, Andreaccio was suspected of unlawful activity—violating

14 state law requiring vehicle registration and display of license plates—so he was required under

15 Nevada law to identify himself when asked by Weaver.  And the Supreme Court deemed

16 requirements for basic identification to law enforcement officers to be consistent with the Fourth

17 Amendment so long as there is reasonable suspicion of criminal activity justifying the stop, as

18

19

20 [103] *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations and quotations omitted).

21 [104] Nev. Rev. Stat. § 171.123(3).

22 [105] *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty*., 542 U.S. 177, 188 (2004).

   [106] *Id.* at 180–181.

23 [107] *Id.* at 188.

   [108] *Id.* at 186.

1  there was here.  Andreaccio thus fails to establish that Weaver violated his constitutional rights

2  by asking for his identification.

3

4  **3.  *Andreaccio cannot establish a Fourth Amendment violation based on his arrest because there was probable cause.***

5  Andreaccio lists false arrest as one of several "[c]ivil [r]ights violations" in the opening

6  of his complaint, alleging that Weaver "displayed a propensity for physical intrusion, going

7  hands-on unprovoked" in apparent reference to Andreaccio's arrest.[109]  Weaver argues that the

8  arrest was constitutional because he had probable cause to detain Andreaccio for failing to

9  identify himself, as required by Nevada law.[110]  Andreaccio responds that he was exempt from

10 the traffic laws that formed the basis for the investigatory stop because he was not operating "in

11 commerce."[111]  He further argues that the Nevada statute that Weaver relies on for the

12 identification requirement does not apply to him because the statute includes the words

13 "presence abroad," and Andreaccio is "of the land" and "not of foreign origin and not in

14 commerce."[112]

15 But Andreaccio's arrest for failure to identify himself was supported by probable cause,

16 and "when an officer has probable cause to believe a person committed even a minor crime in his

17 presence, . . . [t]he arrest is constitutionally reasonable."[113]  "Probable cause exists when, under

18

19 _____

[109] ECF No. 1 at 2, 6.

20 [110] ECF No. 23 at 16–18.

21 [111] *See generally,* ECF No. 26 at 4–13.

22 [112] *Id.* at 11 (citing Nev. Rev. Stat. § 171.123(3)).  Andreaccio's argument that NRS 171.123(3) is inapplicable to him because it contains the words "presence abroad" is meritless.  The statute falls under Chapter 171, which governs public offenses, and the plain reading of NRS 171.123(3) does not suggest that it is meant to apply to foreign or international suspects.

23 [113] *Virginia v. Moore*, 553 U.S. 164, 171 (2008) (collecting cases).

the totality of the circumstances known to the arresting officers . . . a prudent person would believe the suspect had committed a crime."[114]  Instructive here is *Virginia v. Moore*, in which police officers heard over the police radio that the plaintiff was suspected of driving with a suspended license, pulled him over, and arrested him for the misdemeanor of driving on a suspended license.[115]  The United States Supreme Court determined that, despite the fact that Virginia law required officers to issue the plaintiff a summons rather than arrest him, Moore's arrest was constitutional under the Fourth Amendment because the officers had probable cause.[116]

Andreaccio's arrest is based on an even clearer case for probable cause.  Whereas the officers in *Moore* had only secondhand knowledge of the suspected crime, Weaver witnessed firsthand that Andreaccio was violating NRS 171.123(3) by refusing to identify himself fully after being lawfully pulled over under suspicion of driving an unregistered vehicle.  And, unlike in *Moore*, this Nevada statute expressly permits officers to detain a suspect.[117]  So the record does not support Andreaccio's claim that the arrest violated his Fourth Amendment rights.

### E.   Weaver enjoys qualified immunity from Andreaccio's claims arising from the impounding of the vehicle.

Finally, I consider Andreaccio's claim that Weaver violated his constitutional rights by impounding his vehicle.  "The impoundment of an automobile is a seizure within the meaning of

---

[114] *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001) (citing *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)).

[115] *Moore*, 553 U.S. at 166–67.

[116] *Id.* at 167, 176.

[117] Nev. Rev. Stat. § 171.123(3).

the Fourth Amendment."[118]  But "[u]nder the 'community-caretaking' doctrine, police may, without a warrant, impound and search a motor vehicle so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a community-caretaking purpose."[119]  Such impoundment is proper if a vehicle "jeopardize[s] public safety and the efficient movement of vehicular traffic"[120] and "must consider the location of the vehicle, and whether the vehicle was actually impeding traffic or threatening public safety and commerce on the streets."[121]

Weaver invokes this community-caretaking exception and contends that he was justified in impounding Andreaccio's car because "it's simply not safe to leave the vehicle in the middle of the desert" and that he "was promoting public safety and/or the efficient movement or flow of vehicular traffic, and was also likely preventing the car from being vandalized or stolen."[122] Weaver notes that the impoundment was authorized under both Nevada law, which authorizes the seizure of any vehicle operating without proper registration,[123] and Nye County policy and procedures, which permit the towing of any car being operated in violation of the law without valid registration.[124]

---

[118] *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016) (quoting *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005)).

[119] *Id.* (citing *U.S. v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2016)) (cleaned up).

[120] *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976).

[121] *Miranda*, 429 F.3d at 865.

[122] ECF No. 23 at 13.

[123] *Id*. at 11 (quoting Nev. Rev. Stat. § 482.540(1)(a)).

[124] *Id.* (quoting Nye County Sheriff's Office, Policy and Procedures Manual, Policy 0033, "Vehicles: Towing, Impoundment, Seizing, Salvaging, Seizures").

But "the fact that an impoundment complies with a state statute or police policy, by itself, is insufficient to justify an impoundment under the community[-]caretaking exception."[125]  As the Ninth Circuit held in *U.S. v. Cervantes*, the officer must also show that the vehicle's placement or other circumstances supported his need to invoke the community-caretaking exception,[126] and this Weaver fails to do.  Though he argues that Andreaccio's car was a public safety threat, impeded the flow of traffic, and was vulnerable to theft and vandalism, Weaver points to nothing in the record to support these conclusory statements or to show that his decision to impound the vehicle was based on such circumstances.

Indeed, the record tells a different story.  The body-camera video shows Andreaccio's car parked on the side of the highway during the traffic stop for more than two hours without any safety issues or interrupting the flow of traffic occurring throughout.[127]  And the body-camera audio contains Weaver's true reason for ordering the tow: "I don't feel comfortable letting him get back in his car unregistered, uninsured, driving down the highway."[128]  While Andreaccio's continued operation of an unregistered vehicle could pose a public safety threat, that potential hazard is based on the hypothetical that Andreaccio would continue driving his car after the traffic stop, and the defendants do not provide evidence suggesting that was likely to occur.  And at no point in the video does Weaver indicate that he believes the car's location on the highway shoulder poses a safety threat, nuisance to the flow of traffic, or risk of theft or vandalism.  So Weaver has not shown that his impoundment of Andreaccio's car did not violate the Fourth Amendment.

---

[125] *Cervantes*, 703 F.3d at 1141.

[126] *Miranda*, 429 F.3d at 865.

[127] ECF No. 23-5 at 13:55:34–15:56:26.

[128] *Id*. at 14:58:30–38.

But Weaver's inability to claim the protection of the community-caretaking exception is not the end of the analysis.  As Weaver argues,[129] he enjoys qualified immunity from Andreaccio's Fourth Amendment improper-impoundment claim unless the unconstitutionality of his action was clearly established at the time of the stop.[130]  Qualified immunity protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[131]  The United States Supreme Court has warned lower courts to avoid addressing qualified immunity at a high level of generality,[132] and a defendant will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable.[133]  And it's the plaintiff who bears the burden of showing that the rights at issue were clearly established.[134]  Though the plaintiff need not identify a case "directly on point, existing precedent must have placed the statutory or constitutional question beyond debate."[135]

---

[129] ECF No. 23 at 22–23.

[130] *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

[131] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[132] *Saucier*, 533 U.S. at 201; *see also Sheehan v. Cty. of San Francisco*, 135 S. Ct. 1765, 1775–76 (2015); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018).

[133] *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1032 (2012) ("the clearly established prong concerns the reasonableness of the officer's mistake of law."); *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003); *Davis v. Scherer*, 468 U.S. 183, 191 (1984) ("Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of his conduct as measured by reference to clearly established law." (cleaned up)).

[134] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

[135] *Id.*

Andreaccio has not met this burden.  He responds to Weaver's qualified-immunity argument by contending that Nye County officers like Weaver had "prior knowledge" of the "limitations of their duties and responsibilities" because Nye County policies and procedures use words that Andreaccio believes exempt him from traffic laws.[136]  For this proposition, he cites two Supreme Court cases—one discussing plain-language statutory interpretation and the other § 1983 attorney's fees remedies[137]—and the federal statute governing seditious conspiracy.[138] No part of his brief addresses whether the specific rights he asserts were clearly established at the time of the traffic stop, and none of the authority he cites supports that notion.

Even if Andreaccio had shown that he had a constitutional right to not have his vehicle impounded under these circumstances, Weaver would still be entitled to qualified immunity from this claim because the record establishes without genuine dispute that Weaver was reasonable in his belief that it was lawful to impound Andreaccio's vehicle.  The Supreme Court has held that an officer is entitled to qualified immunity if he "reasonably believes that his . . . conduct complies with the law"[139] because immunity is meant to protect "all but the plainly incompetent or those who knowingly violate the law."[140]

Weaver argues that he was relying on Nevada law and Nye County police policies and procedures when he ordered Andreaccio's car to be towed,[141] and these laws and policies objectively support his claim.  NRS 482.540(1)(a) allows "[a]ny police officer, without a

---

[136] ECF No. 26 at 27.

[137] *Id.* (citing *Owen v. City of Indep., Mo.*, 445 U.S. 622 (1980); *Maine v. Thiboutot*, 448 U.S. 1 (1980)).

[138] *Id.* (citing 18 U.S. § 2384).

[139] *Pearson,* 555 U.S. at 244.

[140] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[141] ECF No. 23 at 11–13.

warrant, [to] seize and take possession of any vehicle . . . being operated with improper registration[,]" and the Nye County Sheriff's manual authorizes officers to tow any vehicle "being operated in violation of law with no valid insurance[] or valid registration."[142]  In light of the fact that Weaver (accurately) determined that Andreaccio was driving an unregistered vehicle, and Andreaccio was unable to produce proof of insurance,[143] a reasonable officer could have concluded that impounding the vehicle was lawful based on NRS 482.540(1)(a) and department policies and procedures.  So, Weaver is entitled to qualified immunity from Andreaccio's impoundment claim, and I grant summary judgment in Weaver's favor on this final claim on that basis.

### Conclusion

IT IS THEREFORE ORDERED that the motion for summary judgment **[ECF No. 23] is GRANTED**.  The **Clerk of Court** is directed to **ENTER FINAL JUDGMENT** in favor of defendants Joshua Weaver and Allen Lynn and against plaintiff John Andreaccio on all claims **and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
May 29, 2023

---

[142] Nev. Rev. Stat. § 482.540(1)(a); Nye County Sheriff's Office, Policy and Procedures Manual, Policy 0033, "Vehicles: Towing, Impoundment, Seizing, Salvaging, Seizures."

[143] ECF No. 23 at 5–6.